UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARKEL AMERICAN
INSURANCE COMPANY,

    Plaintiff/Counter-Defendant,

v.

Case No. 10-11667
Hon. Lawrence P. Zatkoff

LORN H. OLSEN,

    Defendant/Counter-Plaintiff.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on May 30, 2013

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This Opinion and Order constitutes the Court's findings of fact and conclusions of law following a bench trial in this matter. For the reasons set forth below, the Court concludes that Plaintiff has failed to satisfy its burden of proof in this matter. The Court awards Judgment in favor of Defendant and against Plaintiff.

**II. BACKGROUND**

**A. FACTUAL BACKGROUND**

On November 6 and 7, 2009, Defendant's vessel, the "Camelot," sank while docked in calm waters in Fort Lauderdale, Florida. The sinking resulted from the failure of a raw water intake hose. Prior to the sinking, Defendant had purchased a policy from Plaintiff to insure the Camelot. After the loss, Defendant demanded proceeds under the terms of the insurance policy, and Plaintiff refused to pay. Defendant argues that the loss is covered by the policy, while Plaintiff argues that the loss was not caused

by covered peril, but instead resulted from "wear and tear" of the raw water intake hose or Defendant's "failure to maintain" the Camelot in good condition.

**B. PROCEDURAL BACKGROUND**

On April 23, 2010, Plaintiff filed its Complaint for Declaratory Relief, seeking a determination by the Court that Plaintiff justifiably denied coverage and has no further contractual responsibility to Defendant. On July 15, 2010, Defendant filed a two-Count Counter-Complaint, claiming that Plaintiff breached the insurance contract and also violated the Uniform Trade Practices Act, Mich. Comp. Laws §500.2001, *et seq*. The parties thereafter filed motions for summary judgment, which the Court denied on March 29, 2012. A three-day bench trial was conducted by the Court on April 2, 3, and 4, 2013.

**C. TRIAL**

During the trial, both parties presented opening statements, introduced exhibits, and called, examined, and cross-examined witnesses. Plaintiff called four witnesses: Randal Roden, Ken Ferch, Robert Taylor, and Robert Skord. Defendant called five witnesses: Eugene Oleszko, Michael Crossland, John Barberis, Mark Crosby and Lorn Olsen. Defendant also re-called Ken Ferch as a witness.

As to the credibility of the witnesses, the Court was guided by the appearance and conduct of the witnesses, by the manner in which the witnesses testified, and by the character of the testimony given. The Court had an opportunity to view the witnesses' reactions to questions, their hand and eye movement, and their facial expressions. Additionally, the Court considered each witness' intelligence, state of mind, motive, demeanor, and manner while testifying, as well as contravening evidence. The Court also considered each witness' ability to observe the facts to which he or she testified and whether the witness appeared to have an accurate recollection of the relevant circumstances.

Additionally, the Court considered and reviewed the parties' written submissions, including a joint final pretrial order and trial briefs containing proposed findings of fact and conclusions of law, the parties' opening statements and updated briefs after the trial concluded.

After carefully reviewing all of this voluminous material, the Court hereby denies Plaintiff's claim for a declaratory judgment and grants Defendant's counterclaim for breach of contract, based on the findings of fact and conclusions of law set forth below.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

In March of 2006, Defendant purchased the "Camelot," a 56-foot yacht manufactured in 1982. The Camelot was insured under a Helmsman Yacht Policy of Insurance, #YH5069549-62 (the "Policy"), issued by Plaintiff. Prior to purchasing the Policy, Plaintiff was required to subject the Camelot to a pre-purchase marine survey to determine the vessel's condition and value. The survey was conducted by Perry's Marine Survey Co. on March 20, 2006. *See, e.g.*, Trial Ex. C. The survey did not reveal any inadequacies with respect to the hose in question except that a clamp designed to keep the hose in place was broken and needed replacement. Defendant replaced the clamp and, based on the survey, Plaintiff saw fit to issue the Policy. The parties do not dispute that the Policy was in effect at all times relevant to this lawsuit.

On or about October 24, 2009, Defendant and several passengers departed Hayes, Virginia, aboard the Camelot to travel to Fort Lauderdale, Florida. Among the passengers at this initial stage of the journey were witnesses Eugene Oleszko ("Oleszko"), Michael Crossland ("Crossland"), and John Barberis ("Barberis")—all of whom were long-time friends of Defendant.

Upon boarding the Camelot and in anticipation of the lengthy voyage, Oleszko saw fit to inspect the vessel to make sure it was seaworthy. Based on his 71 years of boating experience and his career in the navy, Oleszko observed the vessel's engine compartment, bilges, pumps, and hoses, and concluded that the boat had no leaking from its hoses and was indeed well-maintained. Barberis took similar steps, stemming from his 47 years of boating and his experience teaching courses in "safety at sea." As he did before commencing any trip, Barberis inspected the Camelot to ensure its seaworthiness. He visually

inspected the seacocks and engine compartment and saw nothing that concerned him. He also checked the Camelot's hoses and noted that there were no oil or water leaks. Although he had at least once before declined to board a different vessel after discovering safety concerns, Barberis determined that there was nothing alarming about the Camelot and that it was, in fact, well-maintained.

On the second and third days of the voyage, the passengers encountered severe weather conditions that subjected the Camelot to twenty-foot seas, causing the vessel to be raised and then "crashed" onto the ocean numerous times. During the trip, however, the Camelot experienced no mechanical or equipment failures, no leaking, and no taking on of water other than that routinely expected of all water-bound vessels. Defendant performed the normal, routine and regular inspections that he would on any voyage, including inspecting of the bilge areas in the mechanical room where the raw water intake hose was located and changing fuel filters a number of times.

After weathering the storm, the passengers stopped in St. Simons, Georgia, allowing some passengers to leave the vessel and return home, while also picking up at least one new passenger—witness Mark Crosby ("Crosby"). Crosby was another long-time friend of Defendant, a life-long boater, and a pipe-fitter by trade. Upon Crosby's boarding of the Camelot, Defendant walked him through the entire vessel, including the engine compartment. Crosby had no concerns with the Camelot's upkeep or seaworthiness.

After returning to sea, the crew continued on to Florida, arriving in Fort Lauderdale on the morning of Tuesday, November 3, 2009. Upon docking, the Camelot was secured and inspected by Defendant with the assistance of some of the other passengers. Defendant left the Camelot docked in Florida on November 4, 2009.

On November 7, 2009, Defendant received a telephone call advising him that the Camelot had begun taking on water late in the evening on November 6, 2009, and that by the early morning of

4

November 7, 2009, the Camelot was completely submerged at its dock. The parties do not dispute that the vessel sank in calm waters while moored to the dock in Fort Lauderdale.

Defendant submitted a claim to Plaintiff for the loss of the Camelot in November 2009. After receiving the claim, Plaintiff's claims examiner, witness Ken Ferch ("Ferch"), retained a marine surveyor, witness Randal S. Roden ("Roden"), to investigate the cause of the sinking. Roden concluded in his report that the Camelot sank due to the ingress of water through a failed raw water intake hose that: (a) was soft and pliable, and (b) showed signs of wear and tear and deterioration. Roden found that the raw water intake hose of the main engine was approximately 90% severed. Plaintiff then hired witness Robert Taylor ("Taylor"), a licensed professional engineer with expertise in naval architecture, marine and mechanical engineering, and failure analysis, to examine the raw water intake hose. Taylor noted that hoses such as the one at issue do not normally "burst" open to 90%, but instead develop small leaks that, if unrepaired, develop into larger leaks or breaks. Nevertheless, Taylor concluded that the hose failed "due to long-term degradation, wear and tear, and corrosion."

In a letter dated December 1, 2009, Plaintiff denied Defendant's claim based on language in the Policy that excludes loss or damage "caused by or resulting from" "[w]ear and tear, gradual deterioration . . ." and/or "[f]ailure to maintain the insured yacht (including its machinery and equipment) in good condition[.]" The letter stated, in part:

> The hose failed over time due to wear and tear and/or gradual deterioration. The condition of the hose is suggestive that it was original to the vessel and had not been replaced. The vessel sank in calm waters at the dock.
>
> Due to the above stated policy provisions, we cannot provide coverage for your claim as presented. . . .

*See* Ex. 6.

The parties are in agreement that the Camelot sank due to the failure of the raw water intake hose in question, yet disagree as to the *cause* of the hose's failure. Yet, even after extensive investigation and

5

witness testimony presented by the parties, a fully satisfactory explanation for the 90% severance of the hose remains elusive. Against this background, the Court turns to the two grounds on which Plaintiff seeks to deny coverage: (1) that coverage was precluded by Policy exclusions for damage or expense caused by or resulting from "[w]ear and tear, gradual deterioration . . ." and/or "[f]ailure to maintain the insured yacht (including its machinery and equipment) in good condition"[1]; and (2) that Defendant breached the implied warranty of seaworthiness.

**A. POLICY EXCLUSIONS**

The parties agree, correctly, that Michigan law governs this case. Under Michigan law, the Court is tasked with interpreting the language of the policy at issue. *Federal-Mogul U.S. Asbestos Pers. Injury Trust v. Cont'l Cas. Co.*, 666 F.3d 384, 387 (6th Cir. 2011) (citations omitted). In disputes involving coverage exclusions, the insurer bears the burden of demonstrating that a particular policy exclusion is applicable. *See Auto Club Grp. Ins. Co. v. Booth*, 289 Mich. App. 606, 610 (2010) (citing *Heniser v. Frankenmuth Mut. Ins. Co.*, 449 Mich. 155, 161 n. 6 (1995)).

In the absence of specific contractual language to the contrary, Michigan courts have long applied the "proximate cause" standard to determine if coverage was precluded by the occurrence of a particular event. *Berger v. Travelers Ins. Co.*, 379 Mich. 51, 53 (1967); *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 579 (6th Cir. 2010); Couch on Ins. § 101:39 (stating that parties can "'contract out' of this general causation rule, as long as their agreement does not violate public policy"). Proximate cause is "that which *in a natural and continuous sequence, unbroken by any new, independent cause*, produces the injury, without which such injury would not have occurred." *TMW Enters.*, 619 F.3d at 579 (emphasis added) (citing *Mich. Sugar Co. v. Emp'rs Mut. Liab. Ins. Co. of Wis.*, 107 Mich. App. 9, 14 (1981)). "[T]he

---

[1] The Court notes that both grounds merge into one, however, because Plaintiff essentially argues that Defendant breached the warranty of seaworthiness by failing to replace the faulty hose. Nevertheless, the Court addresses each claim in turn.

6

question of proximate cause in insurance cases is generally held to be one for the trier of fact." *Mich. Sugar Co.*, 107 Mich. App. at 14 (citing *Kangas v. N.Y. Life Ins. Co.*, 223 Mich. 238, 244–45 (1923)).

Here, the Policy states that Plaintiff will not pay for loss or damage caused by or resulting from:

1. wear and tear, gradual deterioration, electrolysis, corrosion, rust, mold, rot, marring, denting, scratching, weathering, osmosis or blistering of fiberglass, resin or gelcoat or willful misconduct of an insured;

2. failure to maintain the insured yacht (including its machinery and equipment) in good condition so that the insured yacht can be damaged by ordinary weather or water conditions or the rigors of normal use;

*See* Trial Ex. 1 at pg. 4 (emphasis added). Because the exclusion provision at issue contains no contrary standard, *see Berger*, 379 Mich. at 53, Plaintiff must establish that either 1) "wear and tear" or 2) a "failure to maintain" was the "natural and continuous sequence" that caused the sinking of the Camelot; and additionally 3) that this sequence was exclusive of "any new, independent cause." *See Mich. Sugar*, 107 Mich. App. at 14. For the reasons below, the Court finds that Plaintiff failed to carry this burden.

### 1. Failure to Maintain

Plaintiff argues that Defendant did not adequately maintain the Camelot and that he should have replaced the hose in question for a number of reasons. First, Plaintiff asserts that Defendant failed to engage in preventive maintenance specifically in regard to the hose, i.e., that Defendant should have replaced the hose even if it showed no signs of leaking. According to Plaintiff, simply because the hose was 27 years old, Defendant should have inspected it with a light, mirror, and magnifying glass. Yet, testimony provided by both sides established that there is no "chart" or authority Defendant could have consulted to determine the useful life of the hose in question. As such, it is possible, based on the evidence, that a hose similar to the one in question could be expected to last for 50 or 100 years— rendering moot any argument as to the mere age of the hose.

Second, Plaintiff argues that the hose "looked old," that the exterior was covered with "checks" or cracks, that it was stained with rust, and "paper thin"—all of which indicated that the hose had "never been maintained, much less inspected." The Court disagrees. There is nothing outwardly indicative of the hose having passed any reasonable age threshold—even if one existed. Testimony as to the rust stain was inconclusive since it indicated that the stain could have come from any number of sources. Further, the hose also cannot be characterized as "paper thin," as it appears comparable in thickness to the new hose provided by counsel as an exemplar. As to the "checks" or cracks, even Taylor acknowledged that the marks are only visible upon bending the hose or using a magnifying glass. Regarding past inspections, Plaintiff overlooks the fact that it undoubtedly accepted an inspection of the vessel merely three years prior to the incident, and decided to insure the Camelot on the basis of that inspection. Thus, the appearance and age of the hose do not show that Defendant failed to maintain the Camelot.

Third, Plaintiff argues that the fuel tank was "fo[u]led with a growth that perpetually clogged the filters and required them to be replaced no less than 15 times throughout the voyage," and that a bilge pump switch was non-functional. One of Plaintiff's witnesses, however, rebuts this claim. Skord testified that it is quite common for diesel fuel filters to become clogged by what is commonly known as "diesel fuel algae" (though not actually algae). He further states that clogging is more common when force—such as a storm—is exerted on a vessel, thereby "stirring-up" the algae, causing more of it to enter the fuel lines and clog the filter. As to the bilge pump, Defendant testified credibly that the water level in the bilge never reached the level of the lower automatic float switch. Defendant also testified that he routinely checked the bilge compartment and, although he never found an inordinate amount of water, he would drain the bilge during each inspection. This is supported by testimony from Oleszko, Barberis, and Crosby who affirmed that they never saw an amount of water in the bilge compartment that was outside the norm or would otherwise cause them concern.

Aside from this, the facts support a finding that Defendant was a meticulous and conscientious boat owner who took great care of the Camelot. At trial, Oleszko, Crossland, Barberis, Crosby, and Skord all testified in this regard. Additionally, Defendant's credible testimony as to this and other issues leads the Court to adopt a similar view of Defendant. The Court found Defendant to be a highly competent and skilled individual with respect to the maintenance and mechanical operation of both sea vessels and airplanes. The testimony and evidence show that maintenance of the Camelot was a priority for Defendant and that he spent significant resources in this endeavor. Defendant testified that he regularly inspected and properly maintained the Camelot, repaired or replaced components where he saw fit, and ensured that all other maintenance was performed in a timely and appropriate manner by someone else in the event that he was unable or unqualified to do it. Defendant produced records showing that he spent approximately $75,000.00 for maintenance, repairs and/or improvements to the Camelot during his approximately 3-1/2 years of ownership. *See* Trial Ex. 17. He also noted that, had he paid for outside labor for the maintenance he performed, the cost likely would have been approximately $150,000.00.

Notably, Defendant also provided testimony, supported by the other passengers, that he replaced the fuel filters during the voyage on at least 15 occasions, often for hours on end. Each time he did so, he was within arm's reach of the hose in question, and could have observed any problems or leaking that may have been occurring. He further testified as to the numerous spare parts he kept aboard the Camelot in the event of a failure during a voyage, including a variety of hoses that could serve to replace the hose in question and others, if necessary. In light of this testimony and evidence, it is unlikely that Defendant would have failed to discover any leaks in the hose, and even more unlikely that he would have failed to replace such a hose immediately upon discovering a leak or defect.

As such, Plaintiff has not shown that Defendant failed to maintain the Camelot to such an extent as to cause its sinking.

**2. Wear and Tear**

At trial, the parties established through the testimony of Roden, Taylor, and Skord that hoses that fail from "wear and tear" and deterioration generally do so gradually over a long period of time. This process normally begins with small cracks which later progress into larger cracks, resulting in correspondingly small and larger leaks, until the hose eventually fails. Such a process, if established, could constitute a natural, continuous sequence. As discussed below, however, the evidence in this case contravenes the existence of any such sequence.

### a. Evidence of Leaking

Plaintiff presents no evidence, aside from speculation, to prove that any leaks occurred at any time in question; in fact, the evidence tends to show just the opposite. First, the Camelot underwent a pre-purchase marine survey in March of 2006. The survey found nothing noteworthy regarding the condition of the hose other than the fact that a clamp meant to secure the hose's position was broken (which Defendant replaced). Ferch confirms that, based on the pre-purchase survey, he approved the hose and issued the Policy. Therefore, in March of 2006, the hose was fully-functional, and did not warrant any concern from Plaintiff that it should be replaced.

Second, a post-lightning damage inspection performed by witness Skord in July of 2009 did not reveal that the hose was leaking or damaged. Although Skord noted that he had never seen a hose such as the one in question damaged by lightning, he nevertheless affirmed that he examined the engine compartment during his inspection and does not recall seeing any leaks there, or anywhere, in the Camelot. Had he observed anything that would have raised his caution—irrespective of whether it was related to the scope of his damage inspection—Skord notes that he would have notified both Plaintiff and Defendant. Therefore, as of July of 2009, the hose was fully-functional.

Third, several witnesses—both Plaintiff's and Defendant's—testified to having observed the engine compartment and the hose directly; no one, however, saw any indication that the hose was leaking. Oleszko testified that he performed a pre-trip inspection of the Camelot before beginning the

voyage. Having 60 years of boating experience, including operation and maintenance, Oleszko noted that he would not agree to an ocean voyage on someone else's vessel without first assuring himself of its seaworthiness. Oleszko's inspection, which included viewing into the engine compartment where the raw water intake hose was located, allowed him to conclude that there were no safety concerns on the Camelot; that it was a well-maintained boat; that there were no leaks from hoses or elsewhere, and that the bilge system was operating properly—all conditions that persisted throughout the voyage.

Crossland testified as to his being a passenger/crewman on this trip. Though Crossland was not an experienced boater and, in fact, had never been on a sailboat before or since this voyage, he testified as to the severe conditions and abuse the Camelot endured during the storm. He analogized the Camelot to a basketball being pounded against the floor. He testified as to not being made aware of or overhearing any conversations regarding damage or leaking as a result of that storm. Crossland also attested to a lengthy friendship with Olsen and to having knowledge of Olsen's extremely meticulous habits with respect to maintenance of his boats, airplane, and other mechanical devices he owned.

Barberis testified to his extensive experience as a sailor and as an instructor in boating safety. Barberis conducted a thorough inspection of the Camelot before agreeing to embark on the voyage. Barberis testified that he had on prior occasions refused to participate in similar sailing trips after inspecting the vessel involved in such trips and finding it un-seaworthy and unsafe for him to sail upon. He also testified as to his habit of purposefully inspecting seacocks, since they provide an access point for water to enter the boat. In fact, he testified that upon boarding a vessel, the first seacock he inspects is the one connected to the raw water intake hose, as it could allow significant amounts of water to enter a vessel. Barberis testified that he was satisfied with the results of his inspection and that he saw no leaks or signs of potential problems with this or any other hoses in the engine compartment. Barberis also echoed the other witnesses' opinions regarding Olsen's keen attention to detail and the meticulous manner in which the Camelot was maintained.

11

Crosby testified that although he did not initiate his own inspection, Defendant led him through something similar when Crosby first boarded in Georgia. Crosby indicated that he was very satisfied with the condition of the Camelot and that he was well-aware of Defendant's aptitude and maintenance habits. Crosby saw no evidence of leaks or any other hose problems while on board the Camelot.

Additionally, Defendant testified as to the condition and performance of the raw water intake hose during the voyage and the absence of any observable leaks. Defendant asserts that he routinely checked the bilge compartment and never found an inordinate amount of water.[2] In fact, Defendant testified the water level in the bilge never even reached the level of the lower automatic float switch and, even though below that level, he would drain the bilge during each of his regular inspections of it. Defendant also testified that he changed the fuel filters at least 15 times during the voyage, spending four or more hours in the engine compartment. This placed Defendant within approximately one foot of the raw water intake hose, giving him several opportunities to observe and address any leaks. Defendant, asserts, however, that he saw no such leaks or defects.

Because there is little or no evidence to show the existence of any leaks, the Court finds it unlikely that the hose failed due to "wear and tear" and degradation.

> b. *The Camelot Sank Quickly*

According to Taylor, a naval architect and marine engineer, and Roden, a 31-year marine surveyor, a failure due to "wear and tear" is a slow process that would begin with small leaks that would progress into larger leaks over time before a hose would ultimately become 90% severed.[3] It follows

---

[2] Taylor opined that the twelve inches of water in the bilge reported by Defendant was excessive and a sign of poor maintenance, but this opinion was rebutted by testimony from both Defendant and Crosby.

[3] Roden speculated that the original severance of the hose may have been less than the 90% reported by the salvagers but was worsened when the salvagers plugged the the hose with a rag. Roden acknowledged, however, that he had no facts or evidence to support his theory. Similarly, Taylor speculated that the water that had accumulated in the Camelot's bilge upon docking in Fort Lauderdale probably resulted from a leak in the raw water intake hose, but he offered no facts or evidence to support his position.

then that such a sequence would result in a vessel gradually taking on increasing amounts of water until some point of failure. The Camelot, however, did not follow this pattern. Conversely, the Camelot sank quickly during the late evening of November 6, 2009—without any evidence that the vessel had begun taking on water.

In this regard, the Court finds the testimony of Crosby and Skord to be well-taken. Crosby has extensive boating experience and is a pipe-fitter by trade whose job duties and experience required him to routinely maintain, inspect, and repair hoses similar to the one at issue, and also to replace such hoses when he found it necessary. Crosby testified that, in the absence of any signs of leaking, the 90% severance must have been the result of some external force. Further, according to Skord, a 25-year marine surveyor familiar with failed hoses, the failure process does not usually manifest itself in a 90% severed hose and fast sinking; therefore, it is likely that some other force acted on the hose so as to take it from a 0% to 90% severance. On these bases, the Court finds the fact that the hose suffered a 90% severance and sank over the course of hours to be simply inconsistent with the narrative of a lengthy, age-related failure of the hose. Instead, the 90% severance was more likely facilitated by an external force or cause—namely, the severe storm that battered the Camelot for nearly two days.

### 3. Independent Cause

Even if Plaintiff were able to show that "wear and tear" or "failure to maintain" were in some part responsible for the sinking, Defendant nevertheless provides evidence of a "new, independent cause, [that] produce[d] the injury." *TMW Enters.*, 619 F.3d at 579 . While none of the witnesses could testify with certainty that the severed hose was caused by any particular force, the Court finds that severe weather conditions encountered by the Camelot played a significant role in its sinking.

Aside from Defendant's account that the storm shook the Camelot "like a salt-shaker," several other witnesses testified as to the severity of the storm and the resulting 20-foot seas on the second and third days of the voyage. Oleszko testified that in his many decades of boating, he had "never seen a

storm that bad." He noted that the 20-foot seas repeatedly pulled the Camelot to such an extent that the vessel was at times lifted above the ocean at a 45 degree angle, before crashing down violently into the ocean. Crossland, though a novice boater, seconded Oleszko's report of the Camelot being slammed from a 45 degree angle. Crossland added that he was terrified by the conditions of the storm, noting that the Camelot was "shaking" and "slamming" so hard that he feared it would break in half. Barberis, a 47-year boater, reaffirmed the 20-foot seas and the constant "pounding" the Camelot took for nearly two days. He also noted that even though the hose was affixed to the sea strainer and was not *per se* a "moving part," the physical stress the Camelot endured during the storm could have had an effect on *all* of the vessel's equipment because "everything moves" when a boat is in 20-foot seas—hoses included. In fact, Taylor indicated that the manufacturer used rubber hoses—as opposed to plastic or metal pipes—precisely because the hull and components of the boat inevitably move, especially in harsh conditions, and that hoses must have some "give" to be able to absorb such movement. Accordingly, the Court finds that extreme weather conditions were a major factor in the Camelot's sinking, thereby precluding Plaintiff's reliance on "wear and tear" or "failure to maintain" as proximate causes.

**B. WARRANTY OF SEAWORTHINESS**

Aside from the Policy exclusion claims, Plaintiff also claims that Defendant violated the warranty of seaworthiness. The "warranty of seaworthiness is an absolute duty owed by a ship owner to its crew and, in this case, to its insurer, to provide 'a vessel and appurtenances reasonably fit for their intended use.'" *Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 7 (1st Cir. 2001) (quoting *Mitchell v. Trawler Racer Inc.*, 362 U.S. 539, 550 (1960)). The origins of the warranty rest in the belief that "in order to assess the risk, the underwriter must have the right to assume a certain standard of suitability of the vessel." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 19-16, at 337 (4th ed. 2004). "The Standard [for seaworthiness] is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her

intended service." *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 322 (1964) (internal quotation marks omitted). *See also Morton v. Berman Enters., Inc.*, 669 F.2d 89, 91–92 (2d Cir.1982).

Generally, the insurer bears the burden of showing a lack of seaworthiness and consequent breach. In this case, however, Defendant must overcome a presumption of un-seaworthiness that arises upon a vessel's sinking while moored to a dock in calm water. *Reisman v. New Hampshire Fire Ins. Co.*, 312 F.2d 17, 20 (5th Cir. 1963); *Boston Ins. Co. v. Dehydrating Process Co.*, 204 F.2d 441 (1st Cir. 1953). *See also, e.g.*, Couch on Ins. 3d § 99.33. If the owner produces evidence to the contrary, the burden shifts back to the insurer. *Reisman*, 312 F.2d at 20.

The Court finds that Defendant has provided evidence to rebut the presumption of un-seaworthiness resulting from the Camelot's sinking in calm waters. As discussed above, a hose failure due to "wear and tear" occurs gradually over time. Yet, as attested to by Taylor, Skord, and Roden, there is no evidence of any leak in the hose in question, and a 90% severance is not consistent with typical degradation failure that takes place gradually over time. Additionally, several witnesses testified at trial that Defendant is a meticulous and knowledgeable boat-owner who spent significant time and resources maintaining the Camelot. As such, Defendant has provided evidence that he kept the Camelot seaworthy during the time period in question. The burden of showing un-seaworthiness therefore reverts to Plaintiff. *See id.*

To carry its burden, Plaintiff points to a number of reasons why the Camelot was not seaworthy. These reasons, however, are in effect the same as the arguments discussed—and rejected—above in Section A, since Plaintiff's theory is essentially that Defendant rendered the Camelot un-seaworthy by failing to replace the purportedly degraded hose. Nevertheless, the Court shall briefly address certain of Plaintiff's claims.

First, Plaintiff asserts that Defendant should have performed preventive maintenance on the hose, i.e., he should have replaced the hose even if it showed no signs of leaking. Both parties appear to agree, however, that there is no "chart" or authority that Defendant could have consulted to determine the useful life of the hose in question. Second, Plaintiff argues that the hose "looked old," was covered with "checks" or cracks, was stained with rust, and was "paper thin"—all of which indicated that the hose had "never been maintained, much less inspected." Yet, the appearance and age of the hose do not render the Camelot un-seaworthy, and there is nothing outwardly indicative of the hose having passed any reasonable age threshold—even if one existed. Third, Plaintiff alleges that Defendant allowed the fuel tank to amass "a growth that perpetually clogged the filters and required them to be replaced no less than 15 times throughout the voyage." The Court however, found credible the testimony of Skord explaining that there was nothing uncommon about a diesel fuel tank accumulating "algae," which may become problematic when "stirred up" by harsh conditions.

Fourth, Plaintiff argues that the Camelot was not seaworthy on account of Defendant bringing inexperienced crew members with him on the voyage. This is unavailing. At the very least, Crosby, Oleszko, and Barberis had significant boating experience, with Barberis even being a sea-safety instructor. Notwithstanding this, Plaintiff provides no authority to support his contention that a vessel can be rendered un-seaworthy for failure of its crew to have a particular type or amount of boating experience.

Last, Plaintiff argues that a bilge pump switch was non-functional. Defendant testified credibly that the water level in the bilge never reached the level of the lower automatic float switch and that he routinely checked the bilge compartment, but never found that it contained an inordinate amount of water. Crosby seconded that the amount of water in the bilge was no cause for alarm, and that it was normal for all vessels to take on some amount of water. Notwithstanding this, the absence of an automatic bilge pump is not sufficient to render a vessel unseaworthy when there are other methods—such as a higher

16

level float switch—to dewater the vessel.  *See Fed. Ins. Co. v. PGG Realty, LLC*, 538 F. Supp. 2d 680, 696 (S.D.N.Y. 2008) *aff'd sub nom. Fed. Ins. Co. v. Keybank Nat. Ass'n*, 340 F. App'x 5 (2d Cir. 2009).

For these reasons, Plaintiff has failed to carry its burden of showing that the Camelot was not seaworthy.

## IV.  CONCLUSION

For the above reasons, and upon reviewing all of the evidence, and observing the witnesses at trial, the Court HEREBY ORDERS that Judgment is entered for Defendant against Plaintiff in the amount of $151,694.26 plus interest at a rate of 12% per annum on all past due balances, and all costs of collection, including attorney's fees.

IT IS FURTHER ORDERED that Defendant is permitted 14 days to submit documentation establishing the interest on the unpaid balance and Defendant's collection costs, including attorneys' fees. After the Court reviews such documentation, the additional amounts will be made part of the Judgment.

IT IS SO ORDERED.

Date:  May 30, 2013

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE